**FILED - GR**
June 25, 2026 1:11 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY:ARR  SCANNED BY: AR /6.25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

Antoinette Kay Harrington,
an individual,
                    Plaintiff,

-vs-

Grand Rapids Community College,
a Michigan MCL.389.103 Corporate Body,

                    Defendants.
                                                        /

**1:26-cv-1931**
**Paul L. Maloney**
**United States District Judge**

Antoinette Kay Harrington, in *pro se*
10111 Wolven Avenue, Rockford, Michigan 49341
(616) 970-0842
                                                        /

COMES now Plaintiff, Antoinette Kay Harrington and for her Complaint against the named Defendant alleges as follows:

## JURISDICTION

1.      This action arises under a federal question the Americans with Disabilities Act, 42 U.S.C. § 12111 (2024) *et seq.* ("ADA"), This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  This action also arises under the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367.  While it is upon information and belief the parties in this case are all from the same state, if and in the event this assumption is not accurate, the claims herein exceed the jurisdiction amount for diversity jurisdiction under 28 U.S.C. § 1332(a).

## VENUE

2.      This Court has personal jurisdiction over Defendant because Defendant conducts business in the State of Michigan, and because Defendant has committed such violations individually and/or in concert as alleged in this Complaint. Moreover, Defendant continues to commit such violations in this district.

3.      Venue is proper in this Court pursuant to 28 U.S.C.

§§ 3.4(b), 12191(c), and 12133(d), in that a substantial part of the events giving rise to Plaintiff's claims occurred in the Western District of Michigan and Defendant is subject to personal jurisdiction in the Western District of Michigan.

## COMPLAINT

There is no other pending or resolved civil matter between the parties arising out of the same transaction or occurrence as alleged in the Complaint. There was a pending EEOC Charge before that agency EEOC Charge 23A-2025-00294, which is now closed and waiver to permit this present matter granted per the agency per *"Time-Sensitive EEOC Final Decision for EEOC Charge 23A-2025-00294 / Decisión final urgente de la EEOC por el cargo 23A-2025-00294"* a copy of same being attached hereto as Exhibit "A".

### Jurisdiction and Venue

1.      Plaintiff Antoinette Kay Harrington ("Toni") is a natural person who has resided at all times relevant for the matters within at 10111 Wolven Avenue, Rockford, Michigan 49341.

2.      Defendant Grand Rapids Community College ("GRCC") is, upon information and belief, a Michigan MCL 389.103 Corporate Body, conducting business as a college with corporate office at 143 Bostwick NE, Grand Rapids, Michigan 49503.

3.      For all times pertinent hereunder, Toni was an employee of GRCC until she was terminated from its employ giving notice in November, 2025.

### Factual History - Rheumatoid Arthritis

4.      Toni's employment with GRCC commenced in October 31, 2016 working as a Circulation Specialist in the college library.

5.      In early December, 2019, Toni transitioned to a new position; Support Professional for the Associate Dean of Student Success.

6.      In early February, 2020, Toni was diagnosed with Rheumatoid Arthritis ("RA"). The initial symptoms were manageable with minimal intervention. Management of RA can be successful and may slow or plateau the progress of the incurable disease. Progression of RA can occur and is related to a lot of factors most importantly being social stress. Toni's specialists have advised since the onset of early symptoms in

2020 that preventing increases in RA flares and symptoms will depend on a number of factors including the stress experienced by the patient through social settings, physical demands that press her ability, periods of extreme autoimmune fatigue that occur at times and under circumstances that are considered inappropriate by GRCC.

7.     Toni first disclosed her diagnosis of RA to her employer, GRCC, in Fall of 2020.

8.     RA is an autoimmune disease with an unknown causation. The progression of the disease has four stages ranging from a minimal impact to extremely severe where inflation is provoked in various joints generally. The progression of RA can increasingly attack the joints leading to pain, inflammation, joint damage and eventually disfigurement and loss of function use of joints. Pharmacological support is effective in early stages and less so for cases that are more advanced.

9.     Aside from medically recommended relief, treating physicians have counseled Toni that efforts to minimize RA symptoms require minimalization of stress factors, including those in the work place, as well as maintaining health and fitness. Part of that therapy has included the necessary isolation of Toni from the public at times to avoid pathogenic exposure, especially when she is in the middle of a flare, e.g., inflammatory attack.

10.     Toni has experienced fluctuations in the severity of her RA. There have been periods of time where she has experienced relief resembling a remission, but then the RA has returned over time, typically during or after periods of GRCC required functions. There have been times where the inflammatory attacks have increased, and generally speaking throughout the time frame the GRCC was impeding the accommodation of her disability, the attacks (flares) increased in both frequency and severity.

11.     Toni noted also that when her RA was noticeably more manageable, she would actively gain relief, suggestive of an earlier stage in the RA spectrum. A one-to-one relationship between less inflammation or more inflammation existed in alignment with "functional stress" that occurred when there were levels of accommodation and when there were none. A situation that was tracked by her physicians as well.

12.     RA is medically considered by leading authorities in the field to be a stress related autoimmune disorder not only specifically citing stress as aggravating factor, but as an actual triggering **cause** of the severity of the disease. *International*

111046, *Autoimmunity Reviews* Volume 7, Issue 3, January 2008, Pages 209-213.

13.     Toni's present medical status has seen a step-wise increase in her RA symptoms as both the frequency and severity have increased since February severity 2020.  At the same time, GRCC's level of workplace accommodation has decreased with respect to treatment of Toni's job.  Her workplace accommodations have ceased and/or been modified to be less effective and there has been a corresponding inverse relationship with respect to her RA flares and symptoms, i.e., less accommodation and more flares.  Predictably, when she has been put off work completely through GRCC's insistence that they cannot accommodate her disability, and then later as they terminated her from employment, subsequent medical visits and Toni's perceptions have shown indications of improvement.

14.     Toni's present capabilities and restrictions have been medically evaluated with regard to her RA and under the care of both a rheumatologist and therapist and others as may be needed from time to time.  Generally, at her present level of RA management, she is able to remotely work at her job and on occasion when experiencing a flare, she will for a few days, work reduced hours or on some days no hours. During non-flare periods she has full access to a laptop and connectivity as well as communication via cell phone. She has maintained throughout this matter that she can affect a return to work under proper and effective accommodation.

15.     Toni is prescribed a number of pharmaceuticals for the treatment of her RA.  Some have side effects that are tolerated as part of the RA and as the type and strength of the particular drugs change over time, the therapeutic protocol does require consideration as a restriction as appropriate for the side effect experienced.

### Factual History – The Workplace and RA

16.     Toni's actual job at GRCC differed from the official written job description – as did most GRCC staff jobs did.  In her view, she describes her job as:

"In my role, I primarily focus on supporting students facing unexpected challenges. Around 80% of my time is spent engaging with them individually through email, text, and phone calls to provide comprehensive assistance, aiming to minimize the impact of potential enrollment pauses. I proactively anticipate their needs by compiling detailed information tailored to different scenarios, ensuring clarity and understanding when communicating with students. My

aim is to empower them with the knowledge needed to make informed decisions about their current and future needs, ultimately reducing barriers and facilitating their path to reenrollment. I establish connections with students through various channels, including direct outreach, faculty or staff referrals, and occasionally through the CARES system."

17.    For times relevant to the onset of RA and thereafter, Toni's job was "Support Professional" and she worked under the Associate Dean of Student Success.

18.    Toni's initial workplace experience in dealing with RA commenced February 2020 and by March 10, 2020, the State of Michigan had reported its first known COVID case.  On March 12, 2020, Michigan had ordered public schools closed and many colleges were moving to on-line classes.  On March 13, 2020, President Trump issued an emergency proclamation and on March 15, 2020 GRCC went to remote work status.  Toni disclosed her RA diagnosis formally to her employer in the Fall of 2020. Up to that period of time her RA was managed with minimal medical intervention, comprising the lowest dose and least invasive medicine, with the need for steroids for treating flares approximately three to four time per year.

19.    In retrospect, Toni's remote work status as a non-essential worker was likely a blessing in that the aforementioned stressors were minimalized and the remote work at that time formed a model for her and management at GRCC as a way forward with efficacious management of her RA.

20.    Additionally, to her work as a Support Professional, Toni ran for and won election in Summer of 2021 as the President of the Alliance for Professional Support Staff Union for GRCC staff employees.  Prior to election, Toni had been the Vice President of the Union, and was one of the employees to work on contract negotiations in previous years and was well known by GRCC staff and management as a union representative.

21.    A campus-wide return was issued by GRCC for August 16, 2021, although in Toni's case she had been granted an exemption for her disability under an Americans with Disabilities Act ("ADA") her first ADA request of August 6, 2021 and remained on 100% remote work assignment as accommodation.

22.    On September 21, 2022, Toni had a routine RA visit with her Rheumatologist.  He noted in his record: "Pretty stable RA. There is no indication for medication escalation."

23.    On September 22, 2022, Toni connected with a

therapist, concerned in part about the anticipated expiration of the ADA accommodation and the likelihood of a return to campus.

24. On October 19, 2022, a second accommodation format was implemented by GRCC. The schedule they ordered was two days on remote work assignment and three days on campus. On November 23, 2022, Toni had a visit with her primary care provider noting in the record that she had anxiety, shoulder pain, and had been referred for a consult for potential ADHD.

25. On December 29, 2022, Toni reached out to massage therapy for relief on shoulder and arm concerns.

26. On February 9, 2023, Toni received a confirmed diagnosis of ADHD. February 28, 2023, she requested GRCC to update the accommodation based on the ADHD diagnosis and the increased flares she was experiencing.

27. On February 28, 2023 Toni sent an email to GRCC explaining that without accommodation for the increased flares she would be forced to use PTO. On March 11, 2023, Toni made requests for additional ADA accommodations relating to her request for an ergonomic assessment. Additionally, on March 11, 2023 a request was made for access to Grammarly software which is useful in lessening the stressors on hands/wrists. Both were denied.

28. On March 21, 2023, visit with Rheumatologist resulting in significant medical changes owing to increasing flares. Toni's doctor shifted to biologics for better management of RA. During 2023 and 2024, Toni repeatedly notified GRCC that a required campus presence during active RA flares caused increased inflammation, pain, fatigue, and reduced mobility. Remote work consideration during those periods was delayed, limited, or inconsistently applied. As a result, Toni was forced to choose between using protected leave or working on campus despite active symptoms. The leave usage that resulted from these conditions was later deemed to have expired, and Toni was subsequently suspended based on the asserted pretense that she had not indicated an intent to return, despite documented communications through the EEOC process expressing intent to return to work.

### Factual History – Accommodation History

29. From March 2020 on, Toni performed in her position as Support Professional to the Associate Dean for Student Success for approximately 31 months in a fully remote capacity. During that period of time Toni's performance received positive evaluations and during that time no derogatory performance issues were noted by GRCC and student service

30. On or about August 2021 GRCC issued a directive that all remote work will cease and a mandatory return to campus shall take place.

31. Subsequent to the return to campus directive, GRCC "temporarily excused" some remote work in accommodation cases which demonstrated that remote work was not conflicting with the goals of accommodation and compliance with the employer's duty. Contrarily the number of students serviced while remote increased exponentially and high-level support duties to Associate Dean's Office increased.

32. The evidence of the number is shown by the Late Semester Hardship Withdrawal ("LSHW") applicants serviced along with addition of case management responsibility through CARE network of which Toni was a presenter as part of the hard launch panel during Hybrid 2022 Learning Day.

33. On August 8, 2021, GRCC and Toni entered into the first Accommodation Agreement (the "First Agreement") which sets forth the following key point, "Work from home to the extent possible…essential elements of job make work from home appropriate." This reflected a determination that remote work was compatible with the fundamental duties of my role.

34. On October 19, 2022, GRCC and Toni entered into the second Accommodation Agreement ("Second Agreement") which included the following: "In providing this accommodation, the College will excuse certain essential functions of Toni's position, which may only be performed in-person, while she is working".

35. Toni did actually perform the essential functions of the job as set forth in the Second Agreement, although one function defined as: "Greet and direct visitors, students, and faculty/staff in person and via telephone or e-mail regarding a wide range of issues related to the College" was a function that was only incidental or convenience based and did not go to the essential functions of the job. This was a pretense for claiming a necessity for her presence on campus. The usual course was for students or staff to contact her by phone or email and if a meeting was needed, it would by done by appointment which was mutually effective.

36. There is no evidence that supports GRCC's position that unscheduled walk-ins comprise an essential function of Toni's job that constituted a substantial and indispensable portion of her role nor was it the practice.

During the accommodation process, GRCC relied upon Toni's written position description to define the essential functions of her job. GRCC had previously acknowledged through collective bargaining discussions and across two contract cycles that multiple position descriptions required updating due to inconsistencies with the way actual duties were being performed. The agreed-upon revisions were not completed with existing descriptions being outdated or incongruent. GRCC used the unchanged job descriptions in evaluating accommodation options including flexibility in remote work during active Rheumatoid Arthritis flares.

38.     Reliance on the written job description without confirming alignment with actual, current job duties undermined the accuracy of the essential function determination and the adequacy of the interactive process.

39.     Despite these documented concerns regarding maintenance and accuracy of written job descriptions, the written position description was relied upon in evaluating essential functions during my ADA accommodation process. Given that evidence that annual review and documentation procedures were not consistently followed ADA consideration could hardly be said to be effective, and knowingly so when it came to GRCC.

40.     Evidence does show that Toni's productivity, although not a metric for purposes of ADA administration, was consistently high and equal to or greater than productivity of on-campus expectations. Toni described it this way:

"In my role, I primarily focus on supporting students facing unexpected challenges. Around 80% of my time is spent engaging with them individually through email and phone calls to provide, text, comprehensive assistance, aiming to minimize the impact of potential enrollment pauses. I proactively anticipate their needs by compiling detailed information tailored to different scenarios, ensuring clarity and understanding when communicating with students. My aim is to empower them with the knowledge needed to make informed decisions about their current and future needs, ultimately reducing barriers and facilitating their path to reenrollment. I establish connections with students through various channels, including direct outreach, faculty or staff referrals, and occasionally through the CARES system."

**Factual History – GRCC Accommodation Administration**

The Fall of 2022 marked a change in the administration of the GRCC Accommodation as they stressed the need for a complete return to campus. GRCC was seeking to establish a "hybrid" work arrangement ("Hybrid Work Agreement") which would emphasize the return to the workplace and treat remote work as a temporary accommodation only.

42.     Toni was willing to try the Hybrid Work Agreement but with the obvious caveat that the management of a chronic disease under conditions that were evolving were, at best, speculative, but in a good faith approach and an interest in continuing the progress she had experienced she was willing, expressing directly, "Given that this is an interactive and evolving process I am eager to continue conversations and adapt as circumstances evolve."

43.     For its part, GRCC seemed to take the position that by entering into a Hybrid Work Agreement, the college has absolved itself of its duty to accommodate for a disability under the law.

44.     Prior to signing the agreement, Toni had already indicated on her Disability Accommodation Request Forms (DARF) that her accommodation needs extended beyond COVID-related concerns. The original DARF 2021 Toni supplied to GRCC during the COVID remote work period of time laid out her concerns:

- Remote work as needed for COVID-19 concerns and flares in disease.
- Flexible scheduling related to flare up in disease and brain fog as needed.
- Mobility issues, moving around campus can be a challenge when my body is in poor shape.
- RA is impacting my feet and wrists/hands more so than the rest of my body.
- When in the office our suite is cold. Some consideration to increase the temp for the environment would be beneficial. Fluorescent lighting can be challenging as it is a common trigger for my migraines.
- Moving around and taking frequent breaks is key to preserve my mobility.

45.     Concurrent with the implementation of the Hybrid Work Agreement in the Fall of 2022, Toni submitted her DARF 2022 which included in pertinent part:

**Remote work as needed for COVID-19 concerns.**
**Flares in disease.**
- -Remote work/Flexible scheduling related to flare up in disease and brain fog as needed.
- -Mobility issues, moving around campus can be a challenge when my body is in poor shape.
- -RA is impacting my feet and wrists/hands more so than

- When in the office our suite is cold. Some consideration to increase the temp for the environment would be beneficial.
- -Fluorescent lighting can be challenging as it is a common trigger for my migraines.
- Moving around and taking frequent breaks is key to preserve my mobility.
- Which again included remote work; however, it was discouraged as being applicable to an as needed basis only.

46. Accommodation meetings frequently began with categorical statements that remote work would not be expanded. Internal communications reveal that decisions regarding remote participation were made outside the authority of the designated ADA representative, indicating that modality determinations were driven by executive policy rather than individualized assessment.

47. Within four months of the implementation of the Hybrid Work Agreement, Toni's RA worsened greatly as was documented by her General Practitioner, Dr. Angela Weirich.

48. Upon beginning the Hybrid Work Agreement, it was decided that Toni's supervisor, Raynard Ross would approve or deny remote work as needed during flares. There were no guidelines for what the standard would be to make this determination.

49. Remote work was often denied, even if there was a flare. Remote work was allowed if it was convenient for GRCC, i.e., when there was office remodeling in one case of extended remote, or where Toni was on PTO and she was asked to perform timed sensitive/scheduled work, while off on her own time, if there was no one else available or no replacement.

50. There were many instances where Toni was off because she was medically unable to come in but was able to work remotely. She was called at home and asked to do the work remotely anyway, reply to a student or respond to a colleague, without compensation. Accommodation agreement items recorded in print but denied in practice are not effective or are truly an accommodation.

51. As a result, her PTO was depleted despite often on the same day she was consuming a day of paid leave being asked to perform a work function while off the clock.

52. The administration of the GRCC's accommodation protocol was medically destabilizing and caused and/or aggravated her RA conditions. GRCC's conduct created a

recurring cycle of disease and flare escalation, exhaustion, PTO depletion, and medical destabilization. Not surprisingly, Toni's treatment regimen escalated to a higher stage of RA necessitating biologic medications, steroid reliance, and injections during this same period.

53.     On February 28, 2023, Toni formally notified Jennifer Kelly (GRCC ADA Director) that her medical condition had worsened, including a new diagnosis and increased frequency and severity of RA flares. She specifically communicated that her current accommodation protocol was not sufficient to manage her symptoms during active flares.

54.     Toni received a new, additional diagnosis for a chronic condition, of attention deficit hyperactivity disorder ("ADHD") which she had apprised Jennifer Kelly on that same date by email.

55.     For her part, Toni notified Jennifer Kelly of the following conditions she was experiencing:

- Increased flare activity affecting mobility and physical endurance

- Difficulty performing on-campus work

- Workstation and mobility limitations (on campus)

- Immediate need to either use FMLA (resulting in lost productivity) or temporarily increase remote work days

56.     Toni also informed her that owing to the severity of her condition, she would have to start using her Family Medical Leave Act ("FMLA") which would impact productivity or be left to use her best efforts to continue to work on campus despite her symptoms escalating.

57.     While Jennifer was out of the office at the time, Toni was able to meet with Victoria Kane and Jennifer Kelly soon after the February 28, 2023 email. A discussion was held regarding the increased flares, mobility impacts, and the need for potential adjustment to my accommodation with Victoria Kane and Jennifer Kelly.

58.     On or about March 1, 2023, Toni was informed that her request for effective accommodations for both RA and ADHD was rejected as being unnecessary or premature. She was informed that a "specific issue" would have to be present.

59.     In particular, Victoria Kane, in her response of

March 7, 2023 I was asked whether I was experiencing a repetitive motion injury "now" and was told that support is only provided for conditions "which the college does not make generally available to all employees."

60.    Instead, Ms. Kane Characterized Toni's requests as speculative and suggesting she wasn't currently experiencing medical **harm** dismissing the contents of Toni's communications.

61.    To the contrary, Ms. Kane's medical prowess is misapplied as RA flares are indeed well known to be predictors of medical damage, and are the cause of chronic on-going medical deterioration. *Disease flares in rheumatoid arthritis are associated with joint damage progression and disability: 10-year results from the BeSt study. Arthritis Res Ther. 2015* Aug 31;17(1):232. doi: 10.1186/s13075-015-0730-2, and as reprinted in NIH.

62.    Being dismissive of an RA patient's medical condition, especially in the midst of an active flare, is the height of contraindication. Its diagnosis is predictive with respect to preserving and protecting the patient from increasing serious and crippling damage. It is not normally undertaken casually nor without the consideration of qualified medical specialists.

63.    GRCC had concurrently been pressing its campaign to eliminate remote work as being ineffective and wasteful, and upon information and belief the then current President of GRCC, Dr. Charles Lepper was leading the call for elimination of accommodation via remote work options as a wasteful and unnecessary practice.

64.    Negating support for accommodation as requiring the manifestation of harm in advance of that support, places employees in predictable medically and functionally destabilizing outcomes, particularly for episodic stress related conditions like RA. See, e.g., EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship under the ADA, Section II.A; EEOC v. Ford Motor Co., 782 F.3d 753 (6th Cir. 2015).

65.    GRCC unnecessarily and with gross negligence exposed their employee, Toni, to tangible harm and damage, she did incur such damage in fact, and causing the progression of her RA to exceed what it would have been under the observance of the well understood duty as an employer to do no harm to employees working with a recognized disability.

substituted their judgment for that of Toni's general physician and rheumatologist when determining that RA and associated flares do not present a condition sufficient to be considered as one doing "medical harm".

67. Upon information and belief, neither Meyer nor Jennifer Kelly are board certified physicians nor have they obtained any advanced degree of any kind relating to autoimmune diseases or the treatment of same. Instead, they substituted the economic interest of GRCC into the equation without resort to a competent review by a medical expert.

68. There are faculty at GRCC who are trained in the identification of threats to persons such as Toni who have chronic RA, who have consulted in workplace cases of this kind and who could have supplied appropriate and experienced expertise on the proper handing and care for accommodating a disabled person in a work environment dealing with a chronic autoimmune disease.

69. On or about February 1, 2023, Toni composed and submitted to GRCC a revised DARF

70. The revision included accommodations to address RA and ADHD, **including a faculty-led ergonomic assessment**, digital organization support, and task management tools.

71. At that time, Toni's request for a faculty-led ergonomic assessment was dismissed as "absurd", and something **GRCC doesn't do**, and upon information and belief, the Office of General Counsel did not attempt to consult faculty or other staff with relevant expertise at that time who would've had historical knowledge of past practices or operations.

72. In fact, Toni had identified a feasible and practical approach to determining the scope and effectiveness of accommodation for a disabled employee of GRCC.

73. Importantly, this assessment had been routine practice at GRCC long before 2020, as later revealed through independent advocacy; it was a service regularly provided to other GRCC employees in similar circumstances to Toni's case.

74. As a result of the in-house resource, a **formal ergonomic assessment was completed nearly ten months later,** following persistent internal advocacy on Toni's part. By that time, her medical condition had significantly worsened, she

was approaching exhaustion of PTO, and her RA had escalated to a much higher degree of prescribed medication regimen, including biologics, due to the cumulative impact of physical and environmental stressors and persistent delays in accommodation.

75.    GRCC, through its staff, counsel, or officers, were either negligent in the due diligence conduct of their duties under Michigan and Federal law regarding the past treatment of disabled GRCC workers, or, they knew the existence of previous cases and withheld that information.

76.    In April 2023, following the insistence by the Meyer's office that Toni herself must specifically and (without an ergonomic assessment, or similar personal expertise) independently identify workplace items of impact with regard to her RA and for her to propose ergonomic solutions.

77.    Toni raised concerns about physical aspects of her campus workplace environment, specifically, the heavy entrance and exit doors in the Associate Dean of Student Success office which were physically hard for her to manage and aggravated her shoulders and arms given her RA.  Not an uncommon problem with respect to RA.

78.    In fact, GRCC had door assists installed on doors in other parts of the building housing the Associate Dean of Student Success' office as well as other buildings in the GRCC system under GRCC's management. None where she was normally worked.

79.    Meyer informed Toni her observations were incorrect because the GRCC had recently completed a civil rights compliance assessment the doors were therefore legally acceptable. Again, it appears that GRCC did not test the doors for ergonomic performance in comparison to a worker with RA nor were any ergonomic tests conducted with respect to RA accessibility.

80.    Numerous door systems are commercially available for assisted opening when dealing with accommodation.  A blanket statement that a "door" had passed a compliance inspection is meaningless with respect to accommodation for a RA disability requiring case-specific information and metrics.

81.    In an April 13, 2023 email, Victoria Kane, Director of Equal Opportunity & Title IX Compliance for GRCC, confirmed, herself, the difficulty in opening the subject door(s), noting: "I found them difficult to open, too."

verifiable and observable by GRCC officials, yet Toni's input was minimized by staff responsible for accommodations and compliance.

83.      April 13, 2023 email from the Director of Facilities revealed no remarkable adjustments were made at that time in respect to impact [door adjustment]. It was suggested Toni instead use a circuitous and much longer route using other doors with accessibility buttons.

84.      GRCC had a consistent approach to working on accommodation issues with Toni that included, at times, ridicule, for suggesting solutions for accommodations and cursory rejection of the need for an accommodation whatsoever, usually without resort to accommodation or medical expertise.

85.      In addition, GRCC fostered an environment amongst staff and management where a person with a disability was/is treated with ostracism, derision, or disbelief, this treatment being tolerated by GRCC, to wit; co-workers who ask "It's hard to understand you under that mask," and "I wish I could see you smile." On occasion, comments were more pointed, such as, "It's done. You can remove the muzzle."

86.      Similarly, approaching a management person regarding an issue about disability invites disbelief and challenges.

87.      GRCC has shown a differential in the regard they have for staff as opposed to others within their system.  In a video of Charles Leper, President of GRCC at the time:

"… an environment that creates a sense of belonging. An environment where everyone feels emotionally and physically safe. It takes an environment where everyone feels valued and believes they have the opportunity to contribute and thrive. This goes for our students just not our employees" Section 19, GRCC Video.

**Factual History – Disparate Treatment – Workplace Access**

88.      In Toni's experience, there have been certain select GRCC functions that are withheld or restricted for employees who are disabled workers.  GRCC does maintain its own corporate policy which provides that a qualified employee with a disability is entitled to reasonable accommodation that provides equal access to the benefits and privileges of employment.  See Exhibit B, *"REASONABLE*

was formerly Section 3.2 GRCC Nondiscrimination Policy as the name was changed in December 2024.

89.     At GRCC it is part of its function as an institution of learning that people will congregate, they will collect and come together for many purposes many of which include sharing knowledge, sharing opportunity, sharing skills, sharing news and sharing solutions.

90.     Sharing at GRCC is how an employee grows, improves, collaborates, teaches, and importantly, how they advance.

91.     A disabled employee is disadvantaged when he or she is not allowed or able to share and grow through their workplace interactions.  It is a goal of disability accommodation to overcome the disability itself as an obstacle.  Obstruction of workplace interaction may occur by the intentional choice of the employer to refuse to accommodate the disabled employee. When this occurs, it is discrimination against the disabled worker if that refusal is not justifiable under the law.

92.     In December 2023, Toni inquired whether "Opening Day and Learning Day" a workplace event, would include virtual options for access. She was informed: "There will be no virtual options provided for Opening Day or Learning Day."

93.     Toni asked if attendance was mandatory since she was advised by her physician to avoid crowds because of her RA.  She was told by GRCC attendance was excused in that event.

94.     Excusal is not the same as accommodation. Being told attendance is optional does not provide equal access to professional development, networking, institutional updates, or visibility. It removes the employee from participation rather than enabling participation.

95.     Toni was constructively excluded from attending the Opening Day and Learning Day events although she was allowed to view a recording of Opening Day later on.  She was neither allowed to view Learning Day live and was not able to view a recording.

96.     In another recurring instance, a monthly division meeting was held routinely.  Toni's attendance was, in essence, revoked permanently and no recordings were made available.

In May 2024, Toni requested accessibility to participate virtually in the Vice President for People, Culture & Equity candidate forums, stating: "I am specifically requesting an accessibility to allow me to engage with this event without in person attendance."

98.    In response to Toni's inquiry, she received the following response from GRCC: "No – In person only – **although lakeshore folks will go to a room out there if they would like**."

99.    There was no offer at the time to allow a disabled employee the opportunity to view the forums on-line and/or real time even though the non-disabled lakeshore people had that option and in real time.

100.    Subsequently, a staffer (Labor Relations and Equal Opportunity Generalist) worked to gain access to the recording for Toni, the staffer responded at one point: "The decisions made about remote participation have been outside the scope of my influence but I am working to get equal opportunity for everyone."

101.    The same staffer served as the designated Accommodation Contact and it is noted that even something as routine as watching a video of a company meeting open to all other staffers was outside of her influence when it came to accommodating an employee with a chronic disability.

102.    In fact, the handling of a request for an accommodation request by Toni, a disabled employee who is also the President of the GTCC Staffer's union, was being handled outside the GRCC Accommodation process altogether. It begs the question why.

103.    Although the GRCC IT Department created YouTube links which were then selectively shared, they were distributed privately with instructions: "Please do not share them with anyone else." Employees seeking access were directed to General Counsel (Meyer).

104.    The technology behind the recording and setting up a streaming link for GRCC events was well known and well used technology that was ubiquitously available for other projects.

105.    By way of example, the April 2024 GRCC Strategic Leadership Team (SLT) meeting was expressly structured as a hybrid event, a fully remote or hybrid mode and

invitation stated that the meeting would be held "in Sneden Room 108 and via Remo," provided a virtual platform link, and included instructions for both in-person and virtual attendees. Virtual attendees were assigned tables and directed how to participate fully in real time.

106. Hybrid participation was technologically feasible. Virtual attendance was operationally normalized. Employees could freely elect virtual attendance without demonstrating disability or seeking individualized approval.

107. As a result, it is clear to state that GRCC, at least by Plaintiff's understanding of the SLT meetings, non-disabled employees were routinely permitted hybrid or remote participation. Disabled employees, alternate arrangements were initially denied, treated as "in person only", were handled by General Counsel (Meyer), invitation distributed selectively and confidentially, and framed as an exception rather than standard access.

108. Remote participation was treated as ordinary when linked to convenience or institutional preference, but exceptional and restricted when linked to disability.

109. This pattern constitutes disparate treatment under the ADA because similarly situated employees were afforded different access conditioned on disability status.

110. Being excluded from Learning Day, required to seek executive approval for VP forums, or provided controlled, non-public virtual links is not equivalent to the freely available hybrid participation provided to others.

111. Remote participation in meetings and professional development was routinely available to non-disabled employees as a matter of convenience. However, when requested as a disability accommodation, remote access was restricted, centralized, or denied.

112. The evidence demonstrates that GRCC maintained structural control over participation modalities and subordinated disability access to administrative preference. The resulting effect was unequal access to professional development, leadership visibility, and institutional engagement.

113. GRCC managed/managed the physical college workplace, inclusive of those areas occupied by GRCC staff in their normal workday.

The GRCC college workplace can reasonably involve anything that an employee would use in their work for the company.

115.     GRCC non-disabled employees were granted assist devices to use by GRCC for the sole reason the non-disabled employe desired to use it.   These devices made their work easier, even if they do not have a medically required justification.

116.     Toni saw such equipment being supplied to non-disabled employees. Yet when Toni's medically justified need for a door assist, for example, was requested it was denied.

## COUNT 1 AMERICANS WITH DISABILITIES ACT

### (42 U.S.C. § 12101 et seq, "ADA")

1. Plaintiff repeats the paragraphs set forth above.

2. Plaintiff is a public institution as defined under the ADA.

3. Plaintiff meets the definition of a regulated entity under the ADA.

4. Defendant GRCC has violated, and continues to violate, the ADA under which GRCC is regulated through Title II and III, to wit:

   a. GRCC has denied a valid request for accommodations under the ADA to the Plaintiff

   b. GRCC has offered the same or functionally similar workplace accommodations or conditions for other employees both disabled and non-disabled

   c. GRCC has granted accommodations for Toni and then retracted the same accommodation arbitrarily and without a functional basis or underlying medical/physical assessment

   d. GRCC has failed to comply with the provisions of the ADA, to wit, it has failed to accommodate an eligible employee, and it has discriminated against a disabled employee in favor of non-disabled employees

   e. GRCC's conduct has actually aggravated and/or caused injury to Toni

   f. Defendant GRCC has caused economic harm to Toni by leaving no alternative but to deplete her paid leave time, by not allowing her to work remotely thereby

earning a wage by disenfranchising her from advancement in her position and career, and lastly by terminating her outright by disallowing her to return to work under reasonable conditions that accommodate her medical conditions and citing that for the basis of termination from employment.

Toni's damages have accumulated over time and are expected to continue so long as Defendant GRCC continues to violate her rights. Defendant GRCC's actions are unlawful and are subject to relief under the ADA.

## COUNT 2 – WRONGFUL TERMINATION

### (Supplemental State of Michigan Claim – Elliott-Larsen Civil Rights Act (ELCRA))

1. Plaintiff repeats the paragraphs set forth above.

2. Plaintiff's employment with Defendant GRCC was unilaterally terminated without good cause.

3. Defendant GRCC asserted a pretense excuse to terminate Toni by claiming she could not work and/or return to work under conditions set forth by GRCC

4. The conditions asserted by GRCC were intentionally amended and engineered to target Toni in order to pressure her departure instead of compliance with the legal duties imposed upon GRCC to accommodate her employment.

5. GRCC's actions were illegal under state law and Michigan common law and comprise an injury to Tony.

6. GRCC's actions are compensable under state law and represent past, present and future damages.

## COUNT 3 – INTENTIONAL TORT

### (Supplemental State of Michigan Claim – Battery Common Law)_

1. Plaintiff repeats the paragraphs set forth above.

2. Plaintiff's employment by GRCC was subject to state protections for persons with disabilities that were protected by said laws and regulations.

3. Defendant GRCC and Meyer asserted a pretense excuse

return to work under conditions set forth by GRCC.

4. The conditions asserted by GRCC and Meyer, were intentionally amended and engineered to target Toni in order to pressure her departure instead of compliance with the legal duties imposed upon GRCC to accommodate her employment.

5. Meyer asserted return to work conditions that were provably certain to cause medical exacerbation and causation of injury to Toni and her medical condition. To wit, Meyer asserted that her condition was something that would get better and he stated she could affect a return to work without even conducting an ergonomic review by an expert or consulting a medical expert.

6. GRCC and Meyer, knew or should have known they had ergonomic experts on staff at GRCC, who had performed such tests for accommodations in the past.

7. The in-house experts at GRCC had in fact conducted such exams for the benefit of disabled employees in the past, a fact that was known or should have been known to GRCC and Meyer.

8. By not conducting the appropriate testing, and by making his own assessment, Meyer placed himself in the position of making a skilled assessment for which he was not qualified. By doing so, his failure to perform a competent assessment, he caused serious and profound damage to the Plaintiff in this case, which he thereafter used to bolster his intent to seek her dismissal and/or deny her rights under the law.

9. GRCC's and Meyer's action were illegal under state law and were the product of GRCC's agent for whom GRCC is responsible. Under Michigan common law this conduct comprises an injury to Tony, by unnecessarily aggravating and or causing bodily injury to her which is of long duration and may be permanent.

10. Toni's injuries include her core conditions of RA inclusive of periodic injuries, that have become increasingly more severe over the time of GRCC's actions through which said conduct is casually related to the actual injuries and battery on Plaintiff.

11. GRCC's actions are compensable under state law

## COUNT 4 – UNLAWFUL DISCLOSURE OF PRIVATE FACTS

### (Supplemental State Claim – Common Law Tort of Unlawful Public Disclosure of Private Facts)

1. Plaintiff repeats the paragraphs set forth above.

2. Meyer, as an agent and officer for GRCC, appeared before the EEOC prior to the filing of this action. In that prior matter, Meyer made a presentation which included medical records for Toni that were asserted as "evidence" of a return to work by Toni for which she needed little accommodation.

3. The medical information Meyer supplied had nothing to do with Toni's workplace and was a personal matter subject to Health Insurance Portability and Accountability Act of 1996, 45 CFR 164.524 "HIPAA", Michigan Occupational Safety and Health Act (MCL 408.1001–408.1094), establishes workplace safety standards and includes provisions protecting employee medical records from unauthorized disclosure as well as common law right of protection of nondisclosure pf private facts

4. HIPAA regulations, State of Michigan law and common law required the medical records to remain confidential since they were in the possession of Toni's employer, GRCC.

5. The usage of the medical records as part of the employer's defense was not material to her workplace condition nor did they have anything to do with her treatment and recovery of her disability condition. For purposes of clarity in this Complaint, Toni identifies the medical records used by Meyer as a surgery for an appendicitis.

6. The usage of privileged medical information by Meyer, and by extension, GRCC through their agent and officer, was unlawful and was meant to affect the EEOC matter in that other venue adversely to Toni's protected interest and rights.

7. GRCC has violated Toni's right with the purpose and intent of prejudicing her case which is to take advantage

8. There is no way to "unring" that bell yet Plaintiff has suffered damage by reason of their misconduct and asks for damages to compensate the Plaintiff for Defendant taking unfair advantage of her in the other proceeding.

9. Plaintiff repeats the paragraphs set for above.

WHEREFORE, Plaintiff asks this Court to enter judgment in its favor against Defendant GRCC with respect to those claims as if they had been repeated herein, and granting the following relief:

A. An adjudication that Defendants GRCC is responsible for its actions, both active and through their inaction in and for the following;

B. An accounting of all damages sustained by Plaintiff Toni as a result of Defendant's acts of discrimination, misconduct, noncompliance, torts, violations and the like, whether statutory, under law or by common law;

C. An award to Plaintiff Toni of actual damages adequate to compensate or justly reward her for Defendant's acts and inactions as set forth above, or an equitable or punitive award, or for any damages or awards due in law or equity;

D. An award of Plaintiff's costs of suit and reasonable attorneys' fees pursuant to 35 U.S.C. § 285 due to the exceptional nature of this case, or as otherwise permitted by law along with interest and fees;

E. Any further relief that this Court deems just and proper.

Respectfully submitted,

Dated: _____, 2026

_____

Antoinette Kay Harrington, *in pro se*
10111 Wolven Avenue, Rockford
Michigan, 49341
(616) 970-0842

## DEMAND FOR JURY TRIAL

NOW COMES, Plaintiff and hereby demands jury by trial in the above-captioned matter.

Respectfully submitted,

Dated: 6/25, 2026

Antoinette Kay Harrington, *in pro se*
10111   Wolven Avenue, Rockford
Michigan, 49341
(616) 970-0842

## CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2026, I filed the foregoing Complaint and Jury Demand with the Clerk of the Court by hand delivery to the Office of the Clerk of the Court at Grand Rapids, Michigan.

Respectfully submitted,

Dated: 6/25/2026

Antoinette Kay Harrington, *in pro se*
10111   Wolven Avenue, Rockford
Michigan, 49341
(616) 970-0842